Case 1:22-cv-00134   Document 25   Filed on 10/31/23 in TXSD   Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
October 31, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CRISTINA SALINAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:22-CV-134 |
| | § | |
| ANTONY J BLINKEN, U.S. Secretary of State, | § | |
| | § | |
| Defendant. | § | |

## ORDER AND OPINION

In September 2022, Plaintiff Cristina Salinas filed a Complaint (Doc. 2) pursuant to 8 U.S.C. § 1503(a) of the Immigration and Nationality Act seeking a declaratory judgment that she is a United States citizen and a permanent injunction requiring Defendant Antony J. Blinken, U.S. Secretary of State ("United States"), to issue her a passport.

In June 2023, the United States filed a Motion to Dismiss (Doc. 16) under Federal Rule of Civil Procedure 12(b)(1), asserting that the Court does not have subject matter jurisdiction over the case because Salinas does not meet the residency requirement found in Section 1503(a).[1] The Court has conducted a review of the Motion, the briefing of the parties, the record in this case, and the applicable law. The Court concludes that it possesses subject matter jurisdiction over this lawsuit because Salinas resided in the Southern District of Texas at the time she filed her Complaint.

**I.     Jurisdictional Facts**

   **A. Pre-Filing Events**

In June 2016, Plaintiff Cristina Salinas filed an application for a U.S. passport. (Denial Ltr., Doc. 1–1, 2) In support of her claim, she submitted a birth certificate that listed her place of

---

[1] The United States also argued that the Court must dismiss Salinas's request for injunctive relief because Section 1503(a) only provides declaratory judgment as a remedy. Salinas then withdrew her request for injunctive relief. (Response, Doc. 21, 2 n.1)

birth as McAllen, Texas. (*Id.*; *see also* Birth Certificate, Doc. 1–1, 4–5)  In September 2017, the U.S. Department of State denied the passport application because it determined that the documentation that Salinas submitted was not sufficient to establish by a preponderance of the evidence that she was born in the United States. (Denial Ltr., Doc. 1–1, 2)  This decision constituted the final administrative denial of a U.S. passport.

When Salinas sought the passport, she lived with her brothers, Arturo and Anthony, in a house that Arturo owned in Fort Worth, Texas. (Dep., Doc. 16–1, 24–28)  After Anthony and his family moved out, in 2017 or 2018, Salinas moved to a house that she owned and continues to own in Arlington, Texas. (*Id.* at 28–29, 32, 37)  Around 2021, she bought and moved into a house in Mansfield, Texas, and she continues to own that house as well.[2] (*Id.* at 30–31, 37)  Currently, she rents the house in Mansfield on a month-to-month basis. (*Id.* at 32)

In January 2022, Salinas's brother, Juan Antonio Salinas, began leasing an apartment in Harlingen, Texas. (Juan Interrog., Doc. 16–2, 2, 7)  The following month, he filed a Section 1503 lawsuit in the Southern District of Texas–Brownsville Division, seeking a declaratory judgment that he is a United States citizen. *See* Compl., *Juan Antonio Salinas v. Blinken*, No. 22-CV-019 (S.D. Tex. Feb. 26, 2022), Doc. 1.

Six months later, in July, Salinas contacted the attorney representing her brother in his Section 1503 action.  She then "decided to move to the city of Harlingen in August." (Cristina Interrog., Doc. 16–11, 1)  She concedes that up until then in 2022, she had resided in Mansfield. (Cristina Interrog., Doc. 16–11, 2)

On August 2, Salinas signed a "Lease Contract Amendment", adding her name as a "New Resident" for the apartment that her brother rented in Harlingen. (Dep., Doc. 16–1, 57–58)  Around August 13, Salinas physically moved into the apartment. (Cristina Interrog., Doc. 16–11,

---

[2] The Court takes judicial notice that Fort Worth, Mansfield, and Arlington are cities located in the Northern District of Texas. *See* FED R. CIV. P. 201(b)(2); *Weaver v. United States*, 298 F.2d 496 (5th Cir. 1962).

2; *see also* Dep., Doc. 16–1, 13–16)  Her brother always paid the rent, but Salinas contributed to household expenses by paying "part of the utilities", including for internet and some entertainment services. (Dep., Doc. 16–1, 19–20, ll. 4–10 and 23–24)

When Salinas first traveled to Harlingen in August, she flew with just a carry-on bag containing about one week's worth of clothes. (*Id.* at 60–61)  She brought down additional clothing that month and in September, but she did not move her furniture, documents, accessories, pictures, or mementos. (*Id.* at 61–65)  Rather, in September 2022, she rented a storage unit in Arlington, and hired movers to place her household goods in that unit. (*Id.*)

On August 30, Salinas used online services to obtain a Texas driver's license listing her address in Harlingen. (Pl. Ex. 3, Doc. 1–1, 7)  She had already moved one of her cars to Harlingen in May 2022, leaving it in the care of her brother, but she kept her other vehicle in Mansfield in the care of her sister-in-law. (Dep., Doc. 16–11, 65)  Salinas kept both vehicles registered in Tarrant County, Texas throughout August and September. (*Id.* at 65–66)

As for her profession, Salinas possesses a real estate agent license from the State of Texas. (Cristina Interrog., Doc. 16–11, 2–3; Dep., Doc. 16–1, 12)  Through 2022, Keller Williams Lonestar DFW, operating out of Arlington, was her sponsoring broker. (Cristina Interrog., Doc. 16–11, 4)  When living in North Texas, Salinas at times worked out of Keller Williams's physical office in Arlington, and she represented clients in the Dallas-Fort Worth area. (Dep., Doc. 16–1, 47–49)

Salinas also owns several real estate businesses:  Gusanoc Investments LLC, which owns about eight investment properties in Tarrant and Johnson Counties, Texas; Crisa Real Estate LLC, which assists prospective home renters and buyers; Tiznas Investments LLC, another rental investment company; and Casa Modelo LLC, a company for helping home sellers furnish and decorate their homes for sale. (Dep., Doc. 16–1, 37–46)  None of these businesses maintain a physical office.  Rather, Salinas conducts business through these companies via her computer. (*Id.* at 47) At the start of 2022, Salinas registered her four companies with the Texas Secretary of State

using an address in Arlington. In May, she amended Tiznas's registration to reflect an address in Mansfield. (Certificate of Formation, Doc. 16–6)

Once she moved to Harlingen, Salinas lived in the apartment with her brother. But before filing her lawsuit, she made two trips to Mansfield, the first from August 29 to September 2, and the second from September 17 to 19. (Cristina Interrog., Doc. 16–11, 5; Dep., Doc. 16–1, 68–71) On both occasions, she stayed with her sister-in-law. (*Id.*) During those trips, she made repairs to one of her properties in the area and attended follow-up appointments with a medical provider she had previously seen. (*Id.*)

On September 28, Salinas filed this lawsuit.

### B. Post-Filing Events

After filing her Complaint, Salinas continued to live with her brother in Harlingen. (*See* Cristina Interrog., Doc. 16–11, 5)

In October 2022, she began representing residential buyers in Cameron County, Texas, although she also continued representing clients in the Dallas-Fort Worth area through January 2023. (*See* Greater McAllen Assoc. of Realtors Invoice, Doc. 16–7 (reflecting a Harlingen billing address for Salinas); Dep., Doc. 16–1, 47–49)

With respect to her companies, in November 2022, Salinas changed the registration address for Gusanoc, Crisa, and Casa Modelo to Mansfield. (Statements of Change, Docs. 16–3, 16–4, 16–5) And in January 2023, she changed Gusanoc's, Crisa's, and Tiznas's registrations to Harlingen. (Statements of Change, Docs. 16–8, 16–9, 16–10)

## II.   Analysis

### A. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(1), a trial court must dismiss an action for lack of subject matter jurisdiction when the Court is without the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010

(5th Cir. 1998). The party seeking the federal forum bears the burden of establishing facts supporting federal jurisdiction by a preponderance of the evidence. *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).

In determining whether jurisdiction exists, a court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "[A]ll questions of subject matter jurisdiction except mootness [are] determined as of the date of the filing of the complaint". *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005); *see also Burr v. Transohio Sav.*, No. 95-20144, 1995 WL 798590, at *2 (5th Cir. Dec. 27, 1995) ("The relevant date for determining whether a court has subject matter jurisdiction is the date on which the complaint is filed.") (citing *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994)).

When the factual basis for jurisdiction is in question, the court "may receive interrogatories, deposition, or 'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue." *Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). If the parties dispute facts determinative of jurisdiction, "judges have the power to resolve these disputes in assuring themselves of their court's jurisdiction." *Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010).

### B. The Meaning of "Resides"

Under 8 U.S.C. § 1503(a), "a person who is within the United States [who] claims a right or privilege as a national of the United States and [who] is denied such right or privilege" on the grounds that she is not a national of the United States, may file a declaratory judgment action asking the court to adjudicate her citizenship. This provision mandates that the action "shall be filed in the district court of the United States for the district in which such person *resides or claims*

*a residence." Id.* (emphasis added). The requirement is jurisdictional. *Flores v. Pompeo*, 936 F.3d 273, 276 n.2 (5th Cir. 2019). As a result, in the present matter, the Court must determine whether Salinas resided in the Southern District of Texas at the time that she filed her lawsuit on September 28, 2022.³

The Fifth Circuit has not established the definition of "resides" for purposes of Section 1503(a). In 2020, this Court concluded that the term "means to use a specific location as one's principal, actual dwelling place in fact, without regard to intent." *Villafranca v. Pompeo*, 486 F.Supp. 3d 1078, 1083 (S.D. Tex. 2020). For the following reasons, the Court continues to apply this definition in the current matter.

"When interpreting statutes, we begin with the plain language used by the drafters [and] each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole." *United States v. Uvalle-Patricio*, 478 F.3d 699, 703 (5th Cir. 2007); *see also United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018) ("Text is the alpha and the omega of the interpretive process."). Courts assume that Congress meant the statute's words "to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015). But if Congress defines terms within a statute, those "[s]tatutory definitions control". *Nguyen v. Am. Commercial Lines L.L.C.*, 805 F.3d 134, 140 (5th Cir. 2015) (quoting *Burgess v. United States*, 553 U.S. 124, 129 (2008)).

Within the INA, Congress did not define "resides". When construing terms, courts "often look to dictionary definitions for help in discerning a word's ordinary meaning." *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020). Courts consider "the ordinary meaning of the term . . . at the time that Congress enacted the statute" or added the language at

---

³ In her response to the United States's Motion, Salinas contends for the first time that she claimed a residence in this District. (*Compare* Compl., Doc. 2, ¶ 4 (including solely the jurisdictional allegation that she "resides . . . within the Jurisdiction of this Court"), *with* Resp., Doc. 21, 10 ("By the very act of filing the action, Ms. Salinas was claiming a residence in the district.")). Given the Court's conclusion as to whether Salinas resided in the District when she filed the lawsuit, the Court does not reach the question of whether she alleged (or should be given leave to allege) that she also claimed a residence within the District.

issue. *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 323 (5th Cir. 2021) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). In the current case, the operative language from Section 1503(a) stems from 1952. A contemporary dictionary defines "reside" as follows:

> "to dwell permanently or continuously; to have a settled abode for a time; to have one's residence or domicile; specifically, to be in residence, as the incumbent of a benefice."[4]

*Reside*, Webster's New International Dictionary of the English Language (2d ed. 1958). The principal act in this definition focuses on dwelling or abiding in a specific location—either "permanently or continuously."

In addition, as a general matter, when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012); *see also*, *id*. at 197 (clarifying that "a listing is not a prerequisite" to the canon's application; "[a]n 'association' is all that is required."). In the current context, Congress permitted the filing of a lawsuit in the judicial district in which a plaintiff "resides or claims a residence." The close association of "resides" and "claims a residence" suggests that the Court should construe them similarly. And for purposes of the INA, Congress defined "residence": "the place of general abode", which in turn means the plaintiff's "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). This defined term includes the concept of a dwelling, echoing the dictionary definition for "resides". The fact that the defined term "residence" resembles the ordinary meaning of "resides" is not surprising. In common parlance, persons typically reside in a residence.

---

[4] This definition aligns both with earlier and current definitions of "reside". *See, e.g.*, *reside*, Webster's New International Dictionary of the English Language (2d ed. 1934) (containing an identical definition); *reside*, Merriam-Webster.com Dictionary https://www.merriam-webster.com/dictionary/reside (last visited Oct. 23, 2023) ("to be in residence as the incumbent of a benefice or office; to dwell permanently or continuously; occupy a place as one's legal domicile"); *reside*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/reside (last visited Oct. 23, 2023) ("to live, have your home, or stay in a place"); *reside*, Dictionary.com Unabridged, https://www.dictionary.com/browse/reside (last visited Oct. 23, 2023) ("to dwell permanently or for a considerable time").

It is true that defined terms in a statute do not necessarily bear on the meaning of similar, undefined words. And in the context of Section 1503(a), the Fifth Circuit has explained that whether "'resides' must be construed coextensively with the express definition of 'residence' . . . requires further analysis." *Flores v. Pompeo*, 936 F.3d 273, 278 (5th Cir. 2019) (citing *FCC v. AT&T Inc.*, 562 U.S. 397, 402–04 (2011) ("Adjectives typically reflect the meaning of corresponding nouns, but not always. Sometimes they acquire distinct meanings of their own.")). In *FCC*, the Supreme Court determined whether the defined term "person" should bear on the meaning of the undefined term "personal", for purposes of 5 U.S.C. § 552(b)(7)(C). *FCC*, 562 U.S. at 403. In that case, Congress defined "person" to include corporations. The Supreme Court considered whether the term "personal" in the statute "must mean relating to those 'person[s]': namely, corporations and other entities as well as individuals." *Id.* at 402. Declining to do so, the Supreme Court explained, *inter alia*, that "there is little support for the notion that ["personal"] denotes corporations, even in the legal context." *Id.* at 405. The Supreme Court reasoned that individuals "do not usually speak of personal characteristics, personal effects, personal correspondence, personal influence, or personal tragedy as referring to corporations or other artificial entities." *Id.* at 403. After considering multiple arguments, the Supreme Court concluded that the parties had presented "no sound reason in the statutory text or context to disregard the ordinary meaning of the phrase 'personal privacy'", which excluded information related to corporations. *Id.* at 407.

In the present case, for purposes of Section 1503(a), no sound reason exists to separate the ordinary meaning of "resides" from the Congressionally provided definition for "residence". In contrast to the use of "personal" as to corporations in *FCC*, the parties in the current case present no grammatical arguments explaining why individuals would not normally understand the meaning of "resides" as associated with the meaning of "residence". And the definition that Congress established for "residence" in the INA falls within the ordinary meaning of that word

and does not include any nuances not typically associated with the ordinary meaning of "resides". As a result, based on the ordinary meaning of "resides", and supported by the definition of "residence" from the INA, the Court construes the term "resides" for purposes of Section 1503(a) as requiring that at the time of filing her lawsuit, the plaintiff used a specific location within the District as her principal, actual dwelling place in fact, without regard to intent.

To determine whether a plaintiff has sufficiently established that she resided within the judicial district when filing a Section 1503(a) claim, courts weigh the submitted evidence, which will vary in its nature and weight. For example, using a particular location as one's home address to obtain a voter registration card has substantial weight, as local laws often require that the applicant have substantial ties to the community to vote in local elections.[5]  Similarly, applying for a resident homestead exemption in an appraisal district often requires affirming that the applicant owns and lives in the property at issue. *See, e.g.*, *Form 50-114 Residence Homestead Exemption Appl., Rev. 5-22/36*, TEX. COMPTROLLER OF PUB. ACCTS., PROP. TAX ASSISTANCE DIV., https://comptroller.texas.gov/forms/50-114.pdf (last visited Oct. 26, 2023) (requiring the applicant to respond to the question, "Do you *live in* the property for which you are seeking this residence homestead exemption?" (emphasis added)). Such evidence would support a finding that the plaintiff "resides" at a specific address. On the other hand, the use of an address for services—*e.g.*, utilities, internet, cell phone—bears less weight if the service provider does not require that the service recipient actually live at that address.

As for time period, the ordinary meaning of resides does not establish a specific length of time during which an individual must use a specific location as a principal, actual dwelling place, so as to "reside" in that location. The duration represents only one factor. On the one hand, a

---

[5] For instance, the Texas Election Code requires an individual who registers to vote to make a statement that she "is a resident of that county". TEX. ELECTION CODE ANN. § 13.002 (West 2013). That statute defines residence as "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." *Id.* at § 1.015. Based on these requirements, a valid voter registration card would be some evidence that an individual claimed a residence in the judicial district in which she registered to vote. But as voting laws also allow for absentee voting, a voter registration card is not dispositive proof that the person resides at the registered address.

plaintiff's mere physical presence of a few days in a district, by itself, will be insufficient to satisfy the ordinary meaning of "resides". Such an approach would effectively create a "mere physical presence" standard, which would be inconsistent with the ordinary meaning of "resides". And at least one circuit court of appeals has rejected such a broad construction of the term. *See United States v. Arango*, 670 F.3d 988, 997 (9th Cir. 2012) (concluding that mere physical presence "at the time the complaint was filed does not establish [a plaintiff's] residence there"). On the other hand, an individual may "reside" in a location almost immediately upon entering that location, although other evidence must demonstrate that the individual truly uses that location as a principal, actual dwelling place, and that the individual is not merely visiting the location or using it for a brief stay. Other courts have considered similar factors when determining if the plaintiff resided within the judicial district at the time of filing the lawsuit. *See, e.g., Castillo v. Kerry*, No. 1:16-CV-197, 2017 WL 1293573, at *2 (S.D. Tex. Apr. 7, 2017) (considering where plaintiff attended school and his passport applications and driver's license); *Villarreal v. Horn*, 207 F.Supp.3d 700, 708 (S.D. Tex. 2016) (considering where the plaintiff lived and worked when she filed the lawsuit); *Ortiz-Arriaga v. Castro*, No. 1:12-CV-26, 2013 U.S. Dist. LEXIS 191880, at *18, *21 (S.D. Tex. May 29, 2013) (considering where the plaintiff "spen[t] the majority of his time and engage[d] in the majority of his daily life activities"); *see also United States v. Arango*, 670 F.3d 988, 999 (9th Cir. 2012) (considering "whether [the plaintiff] owned or rented a home in that judicial district, where [s]he paid taxes, where any car was registered and licensed, . . . where [her] possessions were located, and where [her] family members resided.").

### C. Salinas's Residency

Applying these principles to the evidence that the parties submit, the Court concludes that Salinas has demonstrated by a preponderance of the evidence that when she filed her lawsuit, she used the Harlingen apartment as her principal, actual dwelling place in fact.

Salinas moved into the apartment around August 13, which is about six weeks before she filed her lawsuit. Even before her move, she had signed a lease for the apartment, and by the end of August had obtained a driver's license using that address. She moved into the apartment with only limited clothing, but by the end of September had increased her personal possessions in Harlingen. It is true that she did not transport her personal household goods to Harlingen and instead placed them in a storage facility in North Texas. The Government suggests this fact undermines her position. But she moved in with her brother, obviating the need to bring to South Texas all of her household goods. And the fact that Salinas utilized storage in North Texas actually supports her claim. Had she been using the Harlingen address as a temporary location to sleep when she filed her lawsuit, while she actually continued to live in North Texas, she would not have hired movers to place her household goods into storage. In fact, when she traveled to North Texas in September, she stayed with relatives, and not in a property that she owned. In other words, the facts support the conclusion that she did not maintain a dwelling place in both Harlingen and North Texas. Rather, by September, she lived in an actual dwelling in Harlingen, and visited North Texas for medical appointments and other matters.

The Government highlights that when Salinas filed her lawsuit, she continued to own property and businesses in the Dallas-Fort Worth area, conducted significant business in North Texas, and maintained her cars' registrations in Tarrant County. (Motion, Doc. 16, 7–8) Salinas does not challenge the accuracy of these statements, and it is true that individuals typically work in the same area in which they live. But not always. Salinas's business activities and property ownership in North Texas do not directly controvert that she lived in a dwelling in Harlingen for more than a month before she filed her lawsuit. Individuals can own property and businesses in one location, while residing in another. Salinas does not claim that her real estate activities in Cameron County represented her sole business when she filed the lawsuit, or that she divested

herself completely from business endeavors in North Texas. And the ordinary meaning of "resides" does not require as much.

The Government also challenges Salinas's position by highlighting that Salinas's brother, Juan, pays the rent on the Harlingen apartment, while Salinas only pays for "internet, Netflix, and Prime." (Motion, Doc. 16, 7–8) The Government analogizes to one of this Court's prior decisions, in which the Court explained that a plaintiff paying an internet and cable television bill for an address within the district "represent[ed], at best, a weak assertion that the address on that account is an individual's actual dwelling place". (Reply, Doc. 24, 2 (quoting *Villafranca v. Pompeo*, 486 F.Supp. 3d at 1088)) The quoted language, however, concerned whether the plaintiff "claimed a residence" at the time of filing the lawsuit. The Court explained that paying the internet and cable television bills did not require an individual to "claim" that she used the location as her actual dwelling place. As a result, that evidence did not help the plaintiff in that case to establish that she claimed a residence at the specific address. In addition, the utility bill in *Villafranca* constituted "the only relevant evidence supporting [Villafranca's] claim", and Villafranca acknowledged that she had stayed at the address only three days before filing her lawsuit. *Villafranca*, 486 F.Supp. 3d at 1087. In contrast, Salinas relies on the "resides" prong of Section 1503(a). On that issue, she lived in her brother's apartment in Harlingen before initiating this lawsuit, and other evidence supports her position that she used the apartment as her actual dwelling place at the time. (*See, e.g.*, Dep., Doc. 16–11, 57–58 (listing her name on lease agreement for Harlingen apartment); Texas Driver License, Pl. Ex. 3, Doc 1–1, 7 (noting Harlingen address))

With respect to Salinas's brother (Juan), the Government also notes that he indicated that he lived alone, controverting Salinas's contention that she moved in with him. (Motion, Doc. 16, 7 (citing Juan Interrog., Doc. 16–2, 6–7)) In making this argument, however, the Government overlooks the appropriate timing of Juan's statements. In his supplemental answers to interrogatories, he clarified that the statement on which the Government relies concerned his

living status in January 2022, well before Salinas moved in with him. (Juan Interrog., Doc 16–2, 12–13) The Government points to no evidence suggesting that Salinas's brother denies that she moved in with him in August 2022.[6]

Finally, the Government relies on Salinas's interrogatory responses in which she explained that "[p]art of the reason for moving to Harlingen was to start the process to get my passport and to be represented by . . . an attorney that I trust." (Motion, Doc. 16, 12 (citing Cristina Interrog., Doc. 16–11, 1–2)) Although the Government may be skeptical of Salinas's motives for moving to South Texas, the ordinary meaning of "resides" concerns whether an individual actually lives in a dwelling place, not why the individual does so. Salinas's motives do not form part of an objective residency analysis. In addition, Salinas's statement acknowledges that she "mov[ed] to Harlingen," supporting her position that beginning in August 2022, she considered the Harlingen apartment as the dwelling place where she actually lived.

### III. Conclusion

For the reasons explained in this Order, the Court finds by a preponderance of the evidence that for jurisdictional purposes, Plaintiff Cristina Salinas resided in the Southern District of Texas when she filed her Complaint on September 28, 2022.

As a result, it is:

**ORDERED** that Defendant Antony Blinken's Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Doc. 16) is **DENIED**, except as to Plaintiff Cristina Salinas's request for injunctive relief, which is **DISMISSED WITH PREJUDICE.**

Signed on October 31, 2023.

Fernando Rodriguez, Jr.
United States District Judge

---

[6] The Court takes judicial notice that in Juan Salinas's action under 18 U.S.C. § 1503(a), a Magistrate Judge has issued a Report and Recommendation recommending the dismissal of his lawsuit on the grounds that he did not reside in the Southern District of Texas in February 2022, when he filed his lawsuit. *See* R. & R., *Juan Antonio Salinas v. Blinken*, No. 22-CV-019 (S.D. Tex. Sept. 12, 2023), Doc. 42. Where Salinas's brother resided in February 2022, however, does not bear on where Salinas resided in September 2022.